22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-1  ISABEL TCRUZ,
D-2  NOLI TCRUZ, and
D-3  TERRY S. BAUL, M.D.,

        Defendants.

_____/

No. 19-20453
Hon. Denise Page Hood

VIOLATIONS:
18 U.S.C. § 371
42 U.S.C. § 1320a-7b
18 U.S.C. § 2
26 U.S.C. § 7201

FILED USDC - CLRK DET
2020 JUL 23 PM4:28

## **FIRST SUPERSEDING INDICTMENT**

THE GRAND JURY CHARGES:

### **General Allegations**

At all times relevant to this First Superseding Indictment, unless otherwise specified:

### **The Medicare Program**

1.    The Medicare program was a federal health care program providing benefits to persons who were 65 years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      Medicare had four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

4.      Part A of the Medicare program covered inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation.

5.      Part B of the Medicare program covered the cost of physicians' services, medical equipment and supplies, and diagnostic laboratory services. Specifically, Part B covered medically necessary physician office services.

6.      Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

7.      Upon certification, the medical provider, whether a clinic, physician, or other health care provider that provided services to Medicare beneficiaries, was able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. In its enrollment application, a provider was required to disclose to Medicare any person or company who held an ownership interest of 5% or more or who had managing control of the provider. A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for

2

reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider.

8.      A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered or provided the services. When an individual medical provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the individual provider numbers associated with the clinic be placed on the claim submitted to the Medicare contractor.

9.      By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.  Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

10.      Medicare required providers to certify that they understood that payment of a claim by Medicare is conditioned upon the claim and the underlying

3

transaction complying with these laws, regulations, and program instructions, including the federal Anti-Kickback Statute. Medicare would not pay claims procured through kickbacks and bribes.

11.     To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

### Relevant Entities

12.     Maxicare Home Health Agency, Inc. ("Maxicare") was a Michigan corporation doing business at 28905 & 28909 Utica Road, Roseville, Michigan. Maxicare was enrolled as a participating provider with Medicare and submitted claims to Medicare.

13.     Faith Home Care Services ("Faith") was a Michigan corporation doing business at 28431 Utica Road, Roseville, Michigan. Faith was enrolled as a participating provider with Medicare and submitted claims to Medicare.

14.     Affinity Home Care, LLC ("AHC") was a domestic limited liability company organized in the State of Michigan that, from about August 2002 through December 2014, did business in Roseville, Michigan. Also during that time AHC was enrolled as a participating provider with Medicare and submitted claims to Medicare.

15.    Affinity Home Health Services, LLC ("AHHS") was a domestic limited liability company organized in the State of Nevada since March 2006. It was formerly operated under the name Jloam, Inc. ("Jloam"), a Nevada corporation.

16.    Health Max Group LLC ("Health Max") was a domestic limited liability company organized in the State of Arizona that, from about 206 through at least November 2012, did business in Arizona.

### The Defendants

17.    Defendant ISABEL TCRUZ, a resident of Macomb County, Michigan, owned and participated in managing day-to-day operations at Maxicare and Faith, and had signature authority for company bank accounts and managed company finances for Maxicare, Faith, AHHS, and Jloam. During the time period NOLI TCRUZ owned AHC and Health Max, ISABEL TCRUZ had signature authority for AHC and Health Max's bank accounts and managed AHC and Health Max's company finances.

18.    Defendant NOLI TCRUZ, a resident of Macomb County, Michigan, participated in managing day-to-day operations at Maxicare and Faith. From about August 2002 through December 2014, NOLI TCRUZ owned and participated in managing day-to-day operations at AHC, and sold AHC in approximately December 2014. From about 2006 through November 2012 NOLI TCRUZ owned and participated in managing day-to-day operations at Health Max, and sold Health Max in approximately November 2011. NOLI TCRUZ had signature authority for

company bank accounts and managed company finances for Maxicare, Faith, AHHS, Jloam, and Health Max. NOLI TCRUZ also had signature authority for AHC and Health Max's bank accounts and managed AHC and Health Max's company finances during the time period he owned those entities.

19.     Defendant Terry S. Baul, M.D., was a medical doctor who operated a family medicine practice in Detroit, Michigan.

## COUNT 1

### (18 U.S.C. § 371—Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks)

**D-1 ISABEL TCRUZ**
**D-2 NOLI TCRUZ**
**D-3 TERRY BAUL**

20.     Paragraphs 1 through 19 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

21.     From in or around May of 2011, and continuing through in or around January of 2018, the exact dates being unknown to the Grand Jury, in the Eastern District of Michigan, and elsewhere, ISABEL TCRUZ, NOLI TCRUZ, TERRY BAUL, Doctor 1, and Doctor 2 did willfully and knowingly, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury to execute a scheme and artifice to defraud the United States by impairing, impeding, obstructing,

6

and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is:

a. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A)-(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

b. to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a federal health care program, that is, Medicare.

### Purpose of the Conspiracy

22.    It was a purpose of the conspiracy for ISABEL TCRUZ, NOLI

TCRUZ, TERRY BAUL, Doctor 1, and Doctor 2 and their co-conspirators to unlawfully enrich themselves by, among other things, offering, paying, soliciting, and receiving kickbacks and bribes in exchange for referring Medicare beneficiaries' numbers to submit and cause the submission of home health care and other physician services purportedly provided by Maxicare, Faith, and AHC.

### Manner and Means

The manner and means by which the defendants sought to accomplish the purpose of the conspiracy included, among others, the following:

23.    ISABEL TCRUZ and NOLI TCRUZ incorporated or acquired Maxicare, Faith, and AHC, and operated those entities.

24.    ISABEL TCRUZ and NOLI TCRUZ operated Maxicare, Faith, and AHC, which provided home health care services to Medicare beneficiaries.

25.    ISABEL TCRUZ and NOLI TCRUZ certified to Medicare that, in the operation of Maxicare, Faith, and AHC, they would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that they would refrain from violating the Anti-Kickback statute.

26.    ISABEL TCRUZ, NOLI TCRUZ, and others paid and caused the payment of kickbacks and bribes to TERRY BAUL, Doctor 1, and Doctor 2 and others, in exchange for referring Medicare beneficiaries and providing Medicare

beneficiary information that was used to support claims for home health care services by Maxicare, Faith, and AHC to Medicare.

27.     TERRY BAUL, Doctor 1, and Doctor 2 and others solicited and received illegal kickbacks and bribes from ISABEL TCRUZ, NOLI TCRUZ, and others in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information that was used to support false and fraudulent claims by Maxicare, Faith, and AHC.

28.     ISABEL TCRUZ and NOLI TCRUZ submitted or caused the submission of claims to Medicare through Maxicare, Faith, and AHC for home health care services that were provided or purportedly provided to the beneficiaries.

29.     ISABEL TCRUZ and others attempted to disguise the payment of bribes and kickbacks to Doctor 1 and Doctor 2 by executing Medical Director Services Agreements with the doctors on behalf of Faith and Maxicare, respectively.

30.     Contrary to the terms of the Medical Director Services Agreements, Doctor 1 and Doctor 2 did not provide any "medical director services" for Maxicare, Faith, or AHC. Instead, all payments that the doctors received from Maxicare, Faith, and AHC were in exchange for illegally referring Medicare beneficiaries to be patients at Maxicare, Faith, and AHC.

31.     ISABEL TCRUZ and others attempted to disguise the payment of bribes and kickbacks to TERRY BAUL by paying cash and providing gifts to

TERRY BAUL in exchange for illegally referring Medicare beneficiaries to be patients at Maxicare, Faith, and AHC.

32.  ISABEL TCRUZ and NOLI TCRUZ, through Maxicare, Faith, and AHC, attempted to make the payment of bribes and kickbacks to other individuals and entities appear legitimate by executing "marketing agreements" with the individuals and entities.

33.  Under those agreements, ISABEL TCRUZ, NOLI TCRUZ and others paid or caused the payment of illegal kickbacks and bribes to A.M./M.G. and other individuals and entities in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information that was used to support claims by entities controlled by ISABEL TCRUZ and NOLI TCRUZ.

34.  During the course of the conspiracy, ISABEL TCRUZ, NOLI TCRUZ, TERRY BAUL, Doctor 1, and Doctor 2, and their co-conspirators submitted and caused the submission of claims to Medicare of at least $12,000,000.00 for services that were obtained through illegal kickbacks and bribes, and not otherwise eligible for Medicare reimbursement.

**Overt Acts**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in Macomb, Oakland, and Wayne Counties, in the Eastern District of Michigan, and elsewhere, at least one of the following overt acts, among others:

35.    On or about May 2011, ISABEL TCRUZ, on behalf of Faith, and Doctor 1 executed a Medical Director Services Agreement, according to which Doctor 1 was expected to provide various described medical consulting services as a "Medical Director" on behalf of Faith in return for monthly compensation.

36.    Doctor 1 did not serve as Faith's Medical Director, and instead referred Medicare beneficiaries for home health care services to Maxicare, Faith, and AHC.

37.    From July 2011 through January 2018, the exact dates being approximate, ISABEL TCRUZ and NOLI TCRUZ, on behalf of Faith, Maxicare, and AHC, paid and caused the payment of money to Doctor 1 based on the number of Medicare beneficiary referrals or home health care certifications to Faith, Maxicare, and AHC.

38.    Beginning in approximately 2011, and continuing through approximately January 2018, the exact dates being approximate, TERRY BAUL referred Medicare beneficiaries to entities controlled by ISABEL TCRUZ and NOLI TCRUZ for home health care services.

39.     ISABEL TCRUZ paid and caused the payment of money and provided gifts to TERRY BAUL in exchange for referring Medicare beneficiaries to entities controlled by ISABEL TCRUZ and NOLI TCRUZ.

40.     In approximately October of 2014, ISABEL TCRUZ met with Doctor 2, and they agreed that Doctor 2 would be compensated for referring Medicare beneficiaries to Maxicare for home health care. They further agreed that payments to Doctor 2 would be disguised as consulting fees pursuant to a phony Medical Director Services Agreement, signed by ISABEL TCRUZ on behalf of Maxicare and Doctor 2.

41.     From late 2014 through 2017, ISABEL TCRUZ, via checks written by Maxicare and Faith, paid Doctor 2 a fee per patient for referring Medicare beneficiaries to Maxicare and Faith.

42.     On or about September 21, 2017, ISABEL TCRUZ met with Doctor 2 to renegotiate the fee that Doctor 2 would be paid in exchange for new Medicare beneficiary referrals and re-certification of Medicare beneficiaries for home health care. ISABEL TCRUZ and Doctor 2 agreed that Doctor 2 would receive $500 for each new Medicare beneficiary referral and $350 for re-certifying existing Medicare beneficiary referral for home health care.

43.     In approximately November 2015, NOLI TCRUZ met with A.M., and they agreed that Faith would pay A.M., through his company M.G., for referring Medicare beneficiaries to Faith for home health care. They further agreed that

12

payments to A.M./M.G. would be disguised as marketing fees pursuant to an Exclusive Marketing Contract Agreement, which illegally provided that A.M./M.G. would be paid a certain amount "per valid referral."

44.     From November 2015 through 2016, the exact dates being approximate, ISABEL TCRUZ and NOLI TCRUZ, via checks written by Faith, paid A.M./M.G. on a monthly basis a fee per patient for referring Medicare beneficiaries to Faith.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 - 14

### (42 U.S.C. § 1320a-7b(b)(2)(A)—Payment of Kickbacks and Bribes in Connection with a Federal Health Care Program)

**D-1 ISABEL TCRUZ**
**D-2 NOLI TCRUZ**

45.     Paragraphs 1 through 44 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

46.     On or about the dates set forth below, in the Eastern District of Michigan, ISABEL TCRUZ and NOLI TCRUZ, did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, as set forth below:

13

| Count Defendant | Approximate Date of Payment | Physician/ Referrer | Description | Approximate Amount |
|---|---|---|---|---|
| 2 ISABEL TCRUZ | September 21, 2017 | Doctor 2 | Check from Maxicare | $1,000 |
| 3 ISABEL TCRUZ | September 21, 2017 | Doctor 2 | Check from Maxicare | $1,000 |
| 4 ISABEL TCRUZ | October 11, 2017 | Doctor 2 | Check from Maxicare | $1,400 |
| 5 ISABEL TCRUZ | November 13, 2017 | Doctor 2 | Check from Maxicare | $1,500 |
| 6 ISABEL TCRUZ | December 14, 2017 | Doctor 2 | Check from Maxicare | $800 |
| 7 NOLI TCRUZ | August 7, 2012 | Doctor 1 | Check from AHC | $2,500 |
| 8 ISABEL TCRUZ | September 7, 2012 | Doctor 1 | Check from AHC | $2,500 |
| 9 NOLI TCRUZ | November 7, 2014 | Doctor 1 | Check from AHC | $1,500 |
| 10 ISABEL TCRUZ | November 7, 2014 | Doctor 1 | Check from Faith | $1,000 |

| Count Defendant | Approximate Date of Payment | Physician/ Referrer | Description | Approximate Amount |
|---|---|---|---|---|
| 11 ISABEL TCRUZ | December 5, 2014 | Doctor 1 | Check from Faith | $1,000 |
| 12 ISABEL TCRUZ | December 5, 2014 | Doctor 1 | Check from Maxicare | $1,500 |
| 13 ISABEL TCRUZ & NOLI TCRUZ | November 23, 2015 | A.M./M.G. | Check from Faith | $1,200 |
| 14 ISABEL TCRUZ & NOLI TCRUZ | September 15, 2016 | A.M./M.G. | Check from Faith | $600 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## COUNT 15

### (26 U.S.C. § 7201 – Attempt to Evade or Defeat the Payment of Tax)

**D-1 ISABEL TCRUZ**
**D-2 NOLI TCRUZ**

47.    Paragraphs 1 through 19 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

48.    From in or about September of 2007, through the present, the exact dates being unknown to the Grand Jury, in the Eastern District of Michigan and

15

elsewhere, ISABEL TCRUZ and NOLI TCRUZ willfully attempted to evade and defeat the payment of income tax due and owing by ISABEL TCRUZ and NOLI TCRUZ to the United States of America for the calendar years 2006, 2007, 2008, and 2009, which were assessed against ISABEL TCRUZ and NOLI TCRUZ in the total approximate amount of $602,154.91, plus interest and penalties, by committing the following affirmative acts, among others:

## Trust Fund Recovery Penalty

49.     Trust fund taxes are taxes required to be withheld or collected by a third party and paid over to the government, such as employment taxes. The Trust Fund Recovery Penalty ("TFRP") allows the Internal Revenue Service to assess against responsible parties when trust fund taxes are not paid over to the government.

50.     The TFRP may be assessed against any person or group of people who has the duty to perform and the power to direct the collecting, accounting and paying of trust fund taxes and willfully fails to collect or pay the trust fund taxes. The TFRP is assessed and collected in the same manner as a tax.

51.     The TFRP was assessed against ISABEL TCRUZ and NOLI TCRUZ in October and November of 2010 based on the Form 941 Employer's Quarterly Federal Tax Returns filed with the Internal Revenue Service for the following entities and periods:

| Quarter | Year | Entity |
|---------|------|--------|
| 3rd | 2008 | Faith Home Care Services LLC |
| 3rd | 2008 | Affinity Home Care LLC |
| 3rd | 2008 | Affinity Home Health Services LLC |
| 4th | 2008 | Faith Home Care Services LLC |
| 4th | 2008 | Affinity Home Health Services LLC |
| 2nd | 2009 | Faith Home Care Services LLC |
| 2nd | 2009 | Affinity Home Health Services LLC |
| 3rd | 2009 | Affinity Home Health Services LLC |
| 4th | 2009 | Affinity Home Health Services LLC |

**Affirmative Acts**

52.    On or around December 15, 2010, ISABEL TCRUZ and NOLI TCRUZ entered into an installment agreement with the Internal Revenue Service that covered their income taxes for the calendar years 2005, 2006, 2007, 2008 and 2009, Trust Fund Recovery Penalties for the second, third and fourth quarters of 2008 and 2009, and interest and penalties by signing a Form 433-D Installment Agreement. At the time, the amount owed for those time periods was $1,050,448.82, including penalties and interest. The installment agreement outlined the schedule of payments to be $6,500 per month beginning in January of 2011 and later increasing to $7,554 in February of 2012.

53.    ISABEL TCRUZ and NOLI TCRUZ made approximately seven payments under the installment agreement, the last payment in July 2011, and in or around September of 2011, ISABEL TCRUZ and NOLI TCRUZ were no longer in installment agreement status with the Internal Revenue Service.

54.    On or around August 22, 2012, ISABEL TCRUZ and NOLI TCRUZ entered into another installment agreement with the Internal Revenue Service that covered their income taxes for the calendar years 2004, 2005, 2006, 2007, 2008, and 2009, and none of the outstanding Trust Fund Recovery Penalties. At the time, the amount owed for those time periods was $1,056,890.73, including penalties and interest. The installment agreement outlined the schedule of payments to be $4,000 per month beginning in August of 2012.

55.    ISABEL TCRUZ and NOLI TCRUZ made one payment under the installment agreement, the only payment in November 2012, and in or around April of 2013, ISABEL TCRUZ and NOLI TCRUZ were no longer in installment agreement status with the Internal Revenue Service.

56.    ISABEL TCRUZ and NOLI TCRUZ regularly paid their personal expenses directly out of the business accounts for Maxicare, Faith, AHC, AHHS, Jloam, and Health Max. From 2011 through 2015, ISABEL TCRUZ authorized a total of $353,044.43 and NOLI TCUZ authorized a total of $93,268.34 in personal expenses to be paid out of these business accounts. These personal expenses included payments towards the rent and purchase of their Nevada and Michigan residences, home furnishings, residential snow removal, pool maintenance, and their daughter's wedding.

57.     The Internal Revenue Service initiated levies against NOLI TCRUZ's and ISABEL TCRUZ's personal bank accounts at Bank of America in or around May of 2012 and May, June, and November of 2013.

58.     From 2011 through January 2017, ISABEL TCRUZ and NOLI TCRUZ attempted to place funds beyond the reach of the Internal Revenue Service by drawing checks from the Maxicare, Faith, AHC, AHHS, Jloam, and Health Max business bank accounts and, rather than depositing the checks into their personal bank accounts, ISABEL TCRUZ and NOLI TCRUZ signed them over to their son (N.T.) and daughter-in-law (R.T.), totaling $483,730.33 in checks payable to ISABEL TCRUZ and totaling $319,604.70 in checks payable to NOLI TCRUZ.

59.     In or around August 2011, ISABEL TCRUZ and NOLI TCRUZ began leasing their residence in Washington Township, Michigan for $3,900 per month. NOLI TCRUZ and ISABEL TCRUZ later entered into a land contract to purchase the residence for $675,000 with monthly payments of $6,000 per month.

60.     On July 17, 2013, NOLI TCRUZ's and ISABEL TCRUZ's son (N.T.) opened a personal bank account at Bank of America using NOLI TCRUZ's and ISABEL TCRUZ's home address. Over the next several years, N.T. deposited checks from Faith, Maxicare, AHC, and AHHC accounts into his Bank of America account, and funds from the account were used to pay for NOLI TCRUZ and ISABEL TCRUZ's personal expenses.

61.   NOLI TCRUZ's and ISABEL TCRUZ's daughter-in-law (R.T.) opened a business bank account ("Business 1") on May 30, 2014 at Chase Bank. NOLI TCRUZ and ISABEL TCRUZ wrote checks from the Maxicare, Faith, and AHC bank accounts and made them payable to Business 1. From 2014 to 2016, these checks totaled $253,250.

62.   Checks from the Business 1 account were then made payable to NOLI TCRUZ's and ISABEL TCRUZ's son, N.T. The checks were deposited into N.T.'s personal bank account at Bank of America and used to pay NOLI TCRUZ and ISABEL TCRUZ's personal expenses.

63.   On or around November 1, 2012, NOLI TCRUZ sold his membership shares of Health Max.  At the time of closing he received a check for $82,500 and deposited the check into his account at Bank of America on or around January 23, 2013.

64.   On January 7, 2013, NOLI TCRUZ and ISABEL TCRUZ entered into a purchase agreement to purchase a home in Henderson, Nevada for $925,000 and initiated a wire transfer of $150,000 from their personal bank account at Bank of America on or around January 25, 2013 towards the down payment.  In 2014, NOLI TCRUZ and ISABEL TCRUZ wrote four checks made payable to the seller totaling $65,000.

65.   From in and around 2011 through in and around 2017, personal expenses paid by the above-referenced business accounts, directly or indirectly, on

20

behalf of NOLI TCRUZ and ISABEL TCRUZ totaled approximately $909,020.55, and checks from the above-referenced business accounts made payable to NOLI TCRUZ and ISABEL TCRUZ totaled approximately $1,616,239.26.

66.     Since approximately 2017, ISABEL TCRUZ and NOLI TCRUZ have paid $7,865.46 toward their outstanding tax obligations identified above.

All in violation of Title 26, United States Code, Section 7201.

THIS IS A TRUE BILL.

*s/Grand Jury Foreperson*
Grand Jury Foreperson

MATTHEW SCHNEIDER
United States Attorney

REGINA MCCULLOUGH
Chief, Health Care Fraud Unit

*s/Andrew J. Lievense*
ANDREW J. LIEVENSE
A. BRANT COOK
Assistant United States Attorneys

Date:   July 23, 2020

21

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number:<br>19-cr-20453 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based on **LCrR 57.10(b)(4)**[1]: | |
| ☐Yes ☑No | **AUSA's Initials:** |

**Case Title:**    USA v.  D-1 ISABEL TCRUZ, D-2 NOLI TCRUZ, and D-3 TERRY S. BAUL, M.D.

**County where offense occurred:**  Macomb, Oakland, Wayne

**Offense Type:**  Felony

Indictment  --- based upon **LCrR 57.10 (d)** [Complete Superseding section below]

## Superseding Case Information

**Superseding to Case No.:**    19-cr-20453                    **Judge:**    **Denise Page Hood**

**Reason:**
Embraces same subject matter but adds the additional defendants or charges below:

| Defendant Name | Charges | Prior Complaint (if applicable) |
|---|---|---|
| D-1  ISABEL TCRUZ | 18 U.S.C. § 371,<br>42 U.S.C. § 1320a-7b(b)(2)(A),<br>18 U.S.C. § 2, and<br>26 U.S.C. § 7201 | 18-mj-30031 |
| D-2  NOLI TCRUZ | 18 U.S.C. § 371,<br>42 U.S.C. § 1320a-7b(b)(2)(A),<br>18 U.S.C. § 2, and<br>26 U.S.C. § 7201 | N/A |
| D-3 TERRY S. BAUL, M.D. | 18 U.S.C. § 371 | N/A |

FILED USDC - CLRK DET
2020 JUL 23 PM 4:28

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case**

July 23, 2020
Date

Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9665
andrew.lievense@usdoj.gov

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence.  Cases may be companion cases even though one of them may have already been terminated.